IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| REBECCA B. R., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:23CV238 |
| | ) | |
| MARTIN J. O'MALLEY,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Rebecca B. R. ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.      PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on March 22, 2021, alleging a disability onset date of December 15, 2018. (Tr. at 10, 209-10.)[2] Plaintiff's application was

---

[1] On December 20, 2023, Martin J. O'Malley was sworn in as Commissioner of Social Security, replacing Acting Commissioner Kilolo Kijakazi. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should be substituted for Kilolo Kijakazi as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #5].

denied initially (Tr. at 90-101, 121-25) and upon reconsideration (Tr. at 102-14, 127-31). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 132.) On June 1, 2022, Plaintiff, along with her attorney, attended the subsequent telephonic hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 10.) At that time, Plaintiff, through her attorney, amended her alleged onset date to April 12, 2021, the date she turned 50 years old. (Tr. at 10, 47.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 28), and on January 13, 2023, the Appeals Counsel denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II.     LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere

scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." <u>Hancock</u>, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" <u>Id.</u> (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for

"The Commissioner uses a five-step process to evaluate disability claims." <u>Hancock</u>, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." <u>Id.</u>

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." <u>Bennett v. Sullivan</u>, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." <u>Mastro</u>, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." <u>Id.</u> at 179.[4] Step four then requires the ALJ to assess whether, based on

---

determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." <u>Craig</u>, 76 F.3d at 589 n.1.

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." <u>Hines</u>, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." <u>Hall</u>, 658 F.2d at 265. "RFC is to be determined by the ALJ only after

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.    DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her amended alleged onset date, April 12, 2021. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 13.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> Degenerative Disc Disease; Obesity; Hypertension; COPD; Bilateral Knee Osteoarthritis; Low Vision[.]

(Tr. at 13.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 18.) Therefore, the ALJ assessed

---

[the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

Plaintiff's RFC and determined that she could perform light work with the following, additional limitations:

> [Plaintiff] can frequently climb ramps or stairs, and perform frequent balancing and stooping; [she] can occasionally climb ladders, ropes or scaffolds, and occasionally kneel, crouch or crawl; [Plaintiff's] best corrected vision is 20/20 and 20/30; [she] must avoid concentrated exposure to vibration, fumes, odors, dust, gases, poor ventilation, etc., as well as hazards such as machinery and heights.

(Tr. at 18.) At step four of the analysis, the ALJ determined, based on the above RFC and the vocational expert's testimony, that Plaintiff was unable to perform any of her past relevant work. (Tr. at 26-27.) However, the ALJ found at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled under the Act. (Tr. at 27-28.)

Plaintiff now raises two, overlapping challenges to the ALJ's RFC assessment. Specifically, she contends that the ALJ failed to properly account for the impacts of (1) her obesity and (2) the pain caused by her knee and back impairments on her ability to stand and walk up to six hours per day as required to perform light work. (Pl.'s Br. [Doc. #8] at 1.)

With respect to these contentions, Plaintiff argues that the ALJ failed to perform a function-by-function assessment of relevant and contested limitations as required by Social Security Ruling 96-8p ("SSR 96-8p") and Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). As SSR 96-8p instructs, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the functions listed in the regulations. Social Security Ruling 96-8p: Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial

Claims, 1996 WL 374184, at *1 (July 2, 1996). "Only after such a function-by-function analysis may an ALJ express RFC in terms of the exertional levels of work." Monroe v. Colvin, 826 F.3d 176, 179 (4th Cir. 2016) (internal quotations and citations omitted). Further, the "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. An ALJ must "both identify evidence that supports his conclusion and build an accurate and logical bridge from [that] evidence to his conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted).

The Fourth Circuit has noted that a *per se* rule requiring remand when the ALJ does not perform an explicit function-by-function analysis "is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Mascio, 780 F.3d at 636 (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)). Rather, remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. (quoting Cichocki, 729 F.3d at 177). Meaningful review is frustrated, and remand is necessary, if the court is "unable to fathom the [ ] rationale in relation to evidence in the record." Cichocki, 729 F.3d at 177. The court in Mascio concluded that remand was appropriate because it was "left to guess about how the ALJ arrived at his conclusions on [the claimant's] ability to perform relevant functions" because the ALJ had "said nothing about [the claimant's] ability

to perform them for a full workday," despite conflicting evidence as to the claimant's RFC that the ALJ did not address. Mascio, 780 F.3d at 637.

In raising these contentions, Plaintiff also challenges the ALJ's evaluation of Plaintiff's symptom allegations. Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *10 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 404.1529. Moreover, in Arakas v. Commissioner of Social Security, 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

Arakas, 983 F.3d at 95. Thus, the second part of the test requires the ALJ to consider all available evidence, including Plaintiff's statements about his pain or other symptoms, in order

to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work." Craig, 76 F.3d at 595. This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit his ability to perform basic work activities. Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings," id., as well as the following factors set out in 20 C.F.R. § 416.929(c)(3) and 20 C.F.R. § 404.1529(c)(3):

(i)     [Plaintiff's] daily activities;
(ii)    The location, duration, frequency, and intensity of [plaintiff's] pain or other symptoms;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [his] pain or other symptoms;
(v)     Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [his] pain or other symptoms;
(vi)    Any measures [Plaintiff] use[s] or [has] used to relieve [his] pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii)   Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

In the present case, Plaintiff suffered fractures to her ribs and sternum as the result of a motor vehicle accident in November 2019, prior to her April 2021 alleged onset date. (Tr. at 13.) Although the ALJ ultimately found any residuals from these injuries non-severe for purposes of DIB purposes, Plaintiff testified that "she had difficulty getting up and moving around after sustaining these injuries," leading to a fifty-pound weight gain. (Tr. at 13, 48-49.) At Plaintiff's height, variously listed as 5'2" or 5'3", this recent weight gain significantly altered her BMI and the impact of her weight on her other impairments, particularly her ability to stand and walk. Plaintiff further testified, in pertinent part,

that she is unable to work in part due to problems with her back, stating that she experiences back pain that radiates to her left leg, and that her left leg goes

9

numb at times. [Plaintiff] testified that she also has problems with both knees, and testified that she has been told she needs to have both knees replaced, but is unable to because she needs to lose weight and cannot do so because she cannot exercise. Additionally, as a result of these impairments, [Plaintiff] testified that she has difficulty standing, walking[,] and climbing stairs, stating that her left leg goes numb after just twenty minutes of standing, that she sought and obtained a handicap placard for her car in 2021, and that she has to use the motorized cart to get around the store when she goes grocery shopping. [Plaintiff] also testified that she has fallen a couple of times in the past year or so because her knees sometimes give out on her, and [she] testified that she generally tries to elevate her legs when seated because her knees swell. . . . Additionally, as a result of her impairments, [Plaintiff] testified that she has difficulty performing household chores, stating, for example, that she has to sit down while cooking or folding laundry, that she has to sit down for a while after standing to wash dishes, and that she must rely on her children for help with certain household chores. Due to her impairments, [Plaintiff] also testified that she uses a shower chair when bathing, and testified that she generally wears slip-on shoes and clothes without buttons.

(Tr. at 19-20.)

The ALJ acknowledged that Plaintiff's back and knee impairments, particularly when coupled with her obesity, would cause significant limitations. (Tr. at 20-21.) She noted, for example, that

[p]rior to her alleged disability onset date, records show that [Plaintiff] at times complained of back pain with left-sided sciatica, and show that images of her lumbar spine and thoracic spine revealed multilevel degenerative changes. (See, e.g., Exhibit B5F/9, 13-14, 25, 198-201). Similarly, records show that images of [Plaintiff's] cervical spine taken in 2019 revealed signs of mild degenerative disc disease and spondylosis in her neck. (Exhibit B5F/53, 222- 223). Additionally, in September 2021, records show that [Plaintiff] met with orthopedic specialist Kristen Clark, PA-C, and complained of pain in her knees, reporting that her pain had been present for several years, and is exacerbated by activities that include standing, walking, navigating stairs and weight-bearing. (Exhibit B8F/105-108). Those records further show that x-rays of her knees ordered by Ms. Clark revealed signs of osteoarthritis in her left and right knees. (Exhibit B8F/108-109). Additionally, when she returned to Ms. Clark on January 13, 2022, records show [Plaintiff] complained of ongoing bilateral knee pain, and reported experiencing no improvement following the steroid injections administered by Ms. Clark during her aforementioned visit in September 2021. (Exhibit B8F/39-40). As a result, records show that [Plaintiff] was referred to orthopedic surgeon Calvin

McCabe, M.D., who met with [Plaintiff] on January 28, 2022, and noted that she complained of ongoing pain and swelling in her knees, describing her pain as "debilitating." (Exhibit B8F/14-15, 43). Additionally, records show that images of her knees taken by Dr. McCabe that day again revealed signs of severe osteoarthritis in both knees. (Exhibit B8F/18). In addition to the foregoing, records show that [Plaintiff] is morbidly obese, with a Body Mass Index (BMI) that exceeds 40. (See, e.g., Exhibit B6F/9). In accordance with SSR 19-2p, the undersigned has considered that [Plaintiff's] obesity may exacerbate her other impairments, resulting in greater symptoms and limitations than those impairments might otherwise cause on their own. Additionally, when he examined her earlier this year, records show that Dr. McCabe cited [Plaintiff's] obesity as a reason for not recommending knee surgery, and discussed how it may exacerbate her knee pain.

(Tr. at 20-21.) In short, the records reveal that Plaintiff had severe osteoarthritis in her knees for which conservative treatment, including steroid injections, failed. Her imaging showed severe degenerative joint disease in both knees, with "bone-on-bone" in the medial compartments. (Tr. at 774.) Total knee arthroplasty became her only available treatment at this point. However, Plaintiff's obesity precluded surgery. Dr. McCabe's treatment notes convey that Plaintiff did not understand why a BMI of 45 would preclude her from undergoing joint replacement "as she has had family members who are larger than her [have their] knees replaced," and she expressed a desire to meet with a joint replacement surgeon. (Tr. at 798-99.) However, Dr. McCabe explained that, in patients with a BMI greater than 40, the "risk of periprosthetic joint infection is dramatically elevated" and could result in limb loss. (Tr. at 775.)

In evaluating Plaintiff's knee impairment, the ALJ acknowledged that Plaintiff had previously applied for disability benefits, but at that earlier time there was no medical evidence regarding any knee impairment, and the ALJ in the prior case found that Plaintiff's knee pain

Case 1:23-cv-00238-JEP   Document 12   Filed 09/30/24   Page 11 of 17

was not a severe impairment. (Tr. at 72-73.) The ALJ in the present case acknowledged that "significant changes have occurred in the interim", and specifically that:

> during the relevant period since her current alleged disability onset date, records show that the claimant has sought treatment for bilateral knee pain, show that images of her knees have revealed significant degenerative changes, and show that she has been observed to exhibit crepitus and decreased range of motion in her knees.

(Tr. at 26). The ALJ therefore gave little weight to the prior findings. Similarly, the ALJ found unpersuasive the 2018 opinion of the state agency consultant Dr. Flores in that prior application, again noting that Plaintiff may be more limited because "during the relevant period at issue, records show that [Plaintiff] was observed to exhibit crepitus and decreased range of motion in her knees, and show that images of her knees revealed significant generative changes. (Tr. at 25.)

Having discounted these prior findings, the ALJ instead relied on the opinions of the State agency medical consultants in July 2021, both of whom posited that Plaintiff remained capable of a limited range of light work. Here, again, however, timing becomes an issue. The State agency consultant at the initial level, Dr. Nancy Simpkins, issued her opinion on July 1, 2021, while the consultant at the reconsideration level, Dr. Edward Woods, issued his opinion just weeks later, on July 27, 2021. (Tr. at 98, 112.) Both physicians considered Plaintiff's ability to work from her original alleged disability date of December 15, 2018 through the date of their July 2021 opinions. (Tr. at 91, 103.) However, at her hearing, Plaintiff amended her alleged onset date to April 12, 2021. (Tr. at 10.) Accordingly, the relevant time period in this case spans from April 12, 2021 to July 26, 2022, the date of the ALJ's decision. (Tr. at 28.) This shift is crucial given the nature and extent of Plaintiff's later medical records. Neither

State agency consultant had the benefit of reviewing Plaintiff's more recent records relating to her knee impairment, including imaging results demonstrating severe, bone-on-bone contact in both knees, evidence of failed conservative treatment measures, an antalgic gait, significantly varus alignment, and diminished range of motion due to pain. (Tr. at 774.) Significantly, Plaintiff's first medical records reflecting treatment for her knees was in September 2021 (Tr. at 861-64), after the dates of Dr. Simpkins' and Dr. Woods' opinions. Moreover, no other medical opinion evidence addressed Plaintiff's limitations after July 2021. Thus, no medical professional has considered the combined impact of Plaintiff's morbid obesity and knee pain on her ability to stand and walk for up to six hours per day or to otherwise meet the demands of light work during the relevant period.[5]

In attempting to evaluate the evidence of Plaintiff's knee impairment without the benefit of any medical opinion, the ALJ raised three observations. First, the ALJ noted that a treatment note in June 2021, within the relevant period, reflected few complaints regarding her neck and back pain and "normal range of motion in her neck." (Tr. at 21, 23, 24.) However, as noted above, Plaintiff's knee impairment was first reflected in the medical records three months later, in September 2021, and it is not clear how the evaluation of her neck pain in June 2021 would shed light on her knee impairment.

Second, the ALJ noted that Ms. Clark, Plaintiff's orthopedic PA, "repeatedly observed [Plaintiff] to appear in no acute distress, and repeatedly observed her to exhibit no instability

---

[5] This omission proves pivotal in the present case. As Plaintiff correctly notes, had the ALJ had found her limited to sedentary, rather than light, work, the regulations, i.e., "the grids," would have directed a finding of disabled at step five of the sequential analysis. (Pl.'s Br. at 5) (citing 20 C.F.R. Pt. 404, Subpt. P, App'x § 201.14) (directing a finding of disabled for individuals 50 years old with a high school education, no past sedentary work experience, and a lack of transferable skills from past relevant work).

13

in her knees to varus and valgus stress." (Tr. at 21, 23.) The ALJ acknowledged that Plaintiff exhibited tenderness, patellar crepitus, an antalgic gait, and a diminished range of motion in both knees. (Tr. at 21, 23.) Nevertheless, the ALJ emphasized that Dr. McCabe noted that Plaintiff exhibited "intact power and sensation in her lower extremities." (Tr. at 21, 23, 24.) However, Plaintiff counters that she was not limited because she lacked the strength or ability to stand and walk, but because severe, bone-on-bone degenerative joint disease in both knees caused her extreme, limiting pain when doing so. (Pl.'s Br. at 9-10.) As noted by the Fourth Circuit in <u>Oakes v. Kijakazi</u>, "[s]eparate and apart from his literal mobility, [a claimant] can qualify for benefits if he is in sufficient pain. The ALJ failed to meaningfully address this theory of qualification such that this Court may engage in judicial review." 70 F.4th 207, 215-16 (4th Cir. 2023).[6]

Third, the ALJ repeatedly noted Plaintiff's lack of further treatment following her January 28, 2022 appointment. (Tr. at 21.) She notes that Plaintiff did not visit "any nutritionists or other specialists for weight-loss assistance during the relevant period," nor did she follow up with Dr. McCabe or any other orthopedist. (Tr. at 21.) However, in relying on Plaintiff's lack of follow-up care, the ALJ ignores the fact that Plaintiff's administrative hearing took place on June 1, 2022, just four months after her appointment with Dr. McCabe. (Tr. at 10.) Plaintiff's failure to receive follow-up care during this relatively short time period is of limited significance. Nothing in the record indicates that Plaintiff had not scheduled,

---

[6] The ALJ also noted that although Dr. McCabe's examination reflected an antalgic gait in connection with the osteoarthritis in Plaintiff's knees, Plaintiff "was repeatedly observed to exhibit a normal gait" at earlier times throughout the relevant period. (Tr. at 21, 23, 24.) Again, however, the lack of antalgic gait earlier does not necessarily undermine Plaintiff's condition at the time of her treatment for her knee impairment in January 2022, when it had apparently worsened to the point of requiring surgery.

attempted to schedule, or intended to schedule subsequent appointments. Indeed, the records from Dr. McCabe note that Plaintiff was interested in following up with CoreLife for help with weight loss, as part of the discussion that knee replacement surgery was too risky unless she reduced her BMI. (Tr. at 775.) Moreover, given that (1) weight loss is a long-term process and (2) Plaintiff was precluded from surgical options until she dramatically reduced her BMI, her options during the four months at issue were limited by their very nature.[7]

Ultimately, it is possible that Plaintiff is still capable of light work, and in particular standing and walking at least six hours every day, but given the later development of Plaintiff's knee impairment in the medical records and the lack of any medical review or opinion to inform the ALJ's analysis, there is not sufficient information or explanation to support that determination. As noted above, there was no consultative examination and no medical review of Plaintiff's knee impairment, even though her knee impairment was the primary issue that

---

[7] As noted by Plaintiff, there are also issues regarding the extent to which the ALJ discounted Plaintiff's obesity impairment based on her failure to lose weight or seek weight loss assistance. Notably, Social Security Ruling 16-3p only allows ALJs to question a claimant's testimony for failing to follow "prescribed" treatments; the Ruling does not address non-compliance with "recommended" ones. See Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *9 (Oct. 27, 2017). See also Preston v. Heckler, 769 F.2d 988 (4th Cir. 1985) ("If noncompliance is ultimately to be found the basis for denying benefits, it must be found on the basis of a more particularized inquiry than that made here. While the regulatory scheme promulgated by the Secretary does not expressly dictate how the noncompliance inquiry under 20 C.F.R. § 404.1530 meshes with the sequential analysis of disability under 20 C.F.R. § 404.1520, we hold that the burden of producing evidence concerning unjustified noncompliance lies with the Secretary. Therefore, on remand, if noncompliance is to be a basis for denying benefits, the Secretary must develop a record establishing by substantial evidence that the claimant's impairment is reasonably remediable by the particular individual involved, given . . . her social or psychological situation, and that this claimant lacks good cause for failing to follow a prescribed treatment program." (internal citations and quotations omitted)). Plaintiff here noted that she had difficulty losing weight because she could not exercise following her motor vehicle accident and subsequent neck, back, wrist, and knee impairments. (Tr. at 52, 54-55.) In addition, there is no indication she was previously referred to a nutritionist or other specialist for weight loss assistance. The first reference of that kind appears to be Dr. McCabe's treatment note in January 2022, noting that it "may be reasonable at this point to consider medical and/or surgical help with weight loss" given the need for her to lose weight in order to have the knee replacement surgery. (Tr. at 775.) As noted above, that appointment was only four months prior to the hearing in this case, and at that appointment Plaintiff expressed her interest in meeting with a specialist at CoreLife for obesity. (Tr. at 775.)

she raised at the hearing as precluding her from working, specifically with respect to her recent falls and her need to sit, even while doing chores and showering. (Tr. at 52-55.) An ALJ "has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). Development of the record may include ordering a consultative examination, and the regulations address the circumstances under which an ALJ may order such an examination, including where "[t]here is an indication of a change in [the claimant's] condition that is likely to affect [the claimant's] ability to work, but the current severity of [the claimant's] impairment is not established." 20 C.F.R. §§ 404.1519a(b), 416.919a(b). See also Marsh v. Harris, 632 F.2d 296, 300 (4th Cir. 1980) (holding that remand is warranted for failure to develop the administrative record "[w]here the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant"); Oakes, 70 F.4th at 213 (noting that where the evidence in the record is incomplete or insufficient, the ALJ may obtain additional evidence as necessary, including obtaining a medical opinion or a consultative exam).

Because (1) the most recent objective evidence corroborates Plaintiff's testimony of greater limitations, but that evidence was not reviewed by the state agency consultants on whom the ALJ relied, and (2) the reasons cited by the ALJ to discount Plaintiff's allegations prove significantly flawed, and (3) the failure to obtain any medical review or consultative examination regarding Plaintiff's knee impairment left the ALJ to formulate her own lay opinion, the Court cannot conclude that substantial evidence supports the ALJ's decision as

written. Accordingly, on remand, the ALJ should procure the testimony of a medical expert or other evidence appropriate to sufficiently analyze and address Plaintiff's knee impairment, in combination with her prior impairments including obesity.

IT IS THEREFORE ORDERED that the Commissioner's decision finding of no disability is REVERSED, and that the matter is REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). To this extent, it is further ORDERED that Defendant's Dispositive Brief [Doc. #10] is DENIED, and Plaintiff's Dispositive Brief [Doc. #8] is GRANTED to the extent set forth herein.

This, the 30th day of September, 2024.

Joi Elizabeth Peake
United States Magistrate Judge

Case 1:23-cv-00238-JEP   Document 12   Filed 09/30/24   Page 17 of 17